UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                          Case No. 24-CR- 59

KELLY WHITMORE-BEHLING,

        Defendant.

## PLEA AGREEMENT

1. The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Rebecca Taibleson, Assistant United States Attorney, and the defendant, Kelly Whitmore-Behling, individually and by attorney Murdoch Walker, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2. The defendant has been charged in a two-count information, which alleges violations of Title 18, United States Code, Sections 371, 666(a)(1)(A), and 2(a).

3. The defendant has read and fully understands the charges contained in the information. She fully understands the nature and elements of the crimes with which she has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to her by her attorney.

4. The defendant voluntarily agrees to waive prosecution by indictment in open court.

5. The defendant voluntarily agrees to plead guilty to the information, set forth in full as follows:

## BACKGROUND ALLEGATIONS

*At all times relevant to this Information:*

1. KELLY WHITMORE-BEHLING and KYLE HEPP were employed by the City of Milwaukee ("City"), a political subdivision of the County of Milwaukee and the State of Wisconsin, located within the Eastern District of Wisconsin.

2. During each one-year period relevant to this Information, the City received benefits in excess of $10,000 under Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance, and other forms of Federal assistance.

3. KELLY WHITMORE-BEHLING and KYLE HEPP worked for the City's Department of Public Works ("DPW"), which is responsible for maintaining a large fleet of City-owned equipment and vehicles. DPW's responsibilities include disposing of equipment and vehicles that the City no longer needs, or whose repair costs exceed their value to the City.

4. In 2022, KELLY WHITMORE-BEHLING and KYLE HEPP were responsible for selling and disposing of unneeded DPW vehicles and equipment. The proceeds of sales of DPW equipment belonged to the City.

## COUNT ONE
*(Conspiracy To Commit Theft From A Federally Funded Program, 18 U.S.C. § 371)*

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

5. The allegations set forth above are hereby incorporated in support of the following charge as if set forth in full here.

6. Beginning by at least June of 2022, and continuing through about September of 2022, in the State and Eastern District of Wisconsin,

2

**KELLY WHITMORE-BEHLING and KYLE HEPP**

*did knowingly and unlawfully conspire and agree with each other to commit offenses against the United States, specifically, violations of Title 18, United States Code, Section 666(a)(1)(A).*

*Manner and Means*

7. *In their official capacities as DPW employees, WHITMORE-BEHLING and HEPP sold City equipment and vehicles to their friends, family members, and acquaintances, generally for far less than fair market value.*

8. *WHITMORE-BEHLING and HEPP collected cash for many of these sales. In numerous instances, they converted only part of that cash into money orders. They remitted the money orders to the City as payment for the sales. WHITMORE-BEHLING and HEPP then divided the excess cash between themselves.*

9. *WHITMORE-BEHLING and HEPP created fraudulent Bills of Sale to document these transactions for the City, which represented that City equipment and vehicles had been sold for the lower amounts of money that were reflected in the money orders remitted to the City.*

10. *By executing this scheme repeatedly, WHITMORE-BEHLING and HEPP together embezzled and obtained over $100,000 that belonged to the City.*

*Overt Acts*

11. *In furtherance of the conspiracy and to carry out its objects, WHITMORE-BEHLING and HEPP committed and caused to be committed the following overt acts, among others, in the Eastern District of Wisconsin:*

   a. *On or about Saturday, August 20, 2022, WHITMORE-BEHLING and HEPP sold a large quantity of City equipment—approximately 22 pallets of materials, six pieces of welding equipment, and a new replacement fuel tank for a City-owned truck—to buyer R.G. The fair market value of these items was approximately*

$53,000. City records created and maintained by WHITMORE-BEHLING and HEPP, however, show only that R.G. purchased three welders that day for a total of $150.

b. On or about August 22, 2022, HEPP obtained five money orders from a Meijer store, which HEPP signed "R.G.E.," using cash he obtained from R.G. for the purchase of City equipment.

c. On or about August 22, 2022, WHITMORE-BEHLING remitted money orders to the City for the purchase of City equipment by R.G. The money orders totaled far less than R.G. had actually paid, in cash, for the City equipment.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
(Theft From A Federally Funded Program, 18 U.S.C. § 666(a)(1)(A))

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

12. The allegations set forth above in paragraphs 1-4 are hereby incorporated in support of the following charge as if set forth in full here.

13. On or about August 14, 2022, in the Eastern District of Wisconsin,

**KELLY WHITMORE-BEHLING and KYLE HEPP,**

being agents of a local government, did knowingly embezzle, steal, and obtain by fraud property worth at least $5,000 that was under the care, custody, and control of such local government, that is, $12,000 in cash derived from the sale of a John Deere 410G backhoe and a Freightliner truck belonging to the City of Milwaukee.

In violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2(a).

6. The defendant acknowledges, understands, and agrees that she is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case

4

were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish her guilt beyond a reasonable doubt:

   a. The City of Milwaukee ("City") Department of Public Works ("DPW") is responsible for maintaining City-owned equipment and vehicles. DPW's responsibilities include disposing of equipment and vehicles that the City no longer needs, or whose repair costs exceed their value to the City. Historically, DPW has disposed of such equipment or vehicles by selling them at auction, by disposing of them for scrap, or by selling them internally to interested DPW employees.

   b. Kelly Whitmore-Behling began working for the City in about April 2014, and worked in various administrative support roles. Beginning in about April of 2021, she served as a DPW Program Assistant in Fleet Services. Kyle Hepp began working for DPW in about April of 2021 as its Fleet Acquisitions Manager. By 2022, both Hepp and Whitmore-Behling worked on selling or disposing of unneeded DPW vehicles and equipment.

   c. The City of Milwaukee receives federal funds. In fiscal year 2022, according to open source information, the City was awarded approximately $37.2 million in federal funding.

   d. By spring of 2022, City equipment was being sold almost entirely through direct sales to individuals known to Hepp and Whitmore-Behling, rather than through an arms-length auction process. According to City records and analysis, the vast majority of those sales were for far less than the fair market value of the equipment. Hepp and Whitmore-Behling were personally profiting from these sales.

   e. Whitmore-Behling and Hepp formulated a plan to enrich themselves from the sales of City equipment and vehicles: Hepp would collect cash for DPW vehicles and equipment, convert part of that cash into money orders, and provide the money orders to Whitmore-Behling to remit to the City. Whitmore-Behling and Hepp would then divide the excess cash between themselves.

   f. To execute that plan, Hepp reached out to R.G., a person who was not employed by the City and who was interested in buying and re-selling equipment and vehicles. Beginning in approximately June of 2022, a very large proportion of DPW's vehicle and equipment sales were direct sales to R.G.

   g. According to City records—which were created and maintained by Whitmore-Behling and are underinclusive—R.G. purchased at least 74 items from DPW between June and September of 2022. City records indicate that the City collected approximately $35,100 for these items, largely through money orders. The City estimates that the fair market value of these items was approximately $315,850, based on what the City could have received using the City-approved auction house or a commercial recycling/scrap service.

   h. On more than one occasion, Hepp and Whitmore-Behling disposed of large volumes of DPW property by removing loads of equipment from City facilities on weekend

5

days. For example, surveillance footage of DPW's Central Repair Garage revealed that on Saturday, August 20, 2022, 22 pallets of various materials, six pieces of welding equipment, and a new replacement fuel tank for a City-owned truck, were removed from a secure stockroom and loaded onto a large platform truck and a stake bed truck. DPW's surveillance footage shows Hepp and Whitmore-Behling assisting in the removal of these items, and R.G. present at the scene to drive them away. The City assessed a fair market value of these items at approximately $53,186, based on what the City could have received using the City-approved auction house or, to the extent the items could not be auctioned, recycling the items. The sale records maintained by Whitmore-Behling, however, do not reflect any of these purchases, and the Bills of Sale that the City has on file indicate that on August 20, 2022, R.G. purchased just three welders from DPW for a total of $150.

i. After acquiring DPW equipment and vehicles, R.G. would typically resell it, often at a significant profit. For example, in August of 2022, according to DPW records maintained by Whitmore-Behling, the City recorded the sale of a 2004 John Deere 410G backhoe for $2,000 to R.G. The City estimated the backhoe's fair market value to be approximately $35,000. In September of 2022, R.G. sold that 2004 John Deere 410G backhoe to a third-party buyer for $26,500.

j. R.G. saved some of the Bills of Sale that Hepp provided to him for his purchases from DPW. According to R.G., the prices on his Bills of Sale reflect the amounts that R.G. paid to Hepp for DPW equipment. The Bills of Sale that Hepp and Whitmore-Behling maintained for City records, however, showed very different—and always lower—prices paid for the same items. For example, City records and the City's Bill of Sale reflect that R.G. paid a total of $4,000 ($2,000 each) for a 2004 John Deere 410G backhoe with equipment number 52135A (as discussed above), and a 2001 Freightliner truck with equipment number 26220A. The City collected eight $500 Western Union Money Orders (for a total of $4,000) for that transaction. R.G.'s Bill of Sale from DPW, however, reflects that he paid $16,000 for both of these items.

k. Hepp required R.G. to pay cash for almost every item that he purchased. R.G. would hand cash directly to Hepp at his DPW office, and R.G. would collect the Bill of Sale as his receipt. Only on approximately two occasions did R.G. pay with a cashier's check, rather than cash.

l. As Hepp and Whitmore-Behling had planned, Hepp would then use some of the cash paid by R.G. to purchase Western Union money orders, most of which were obtained at Meijer and were initialed "R.G." or "R.G.E." Whitmore-Behling would collect the money orders, and a copy of the Bill of Sale (with the lower price, reflecting the amount of the money orders), from Hepp for each transaction. Whitmore-Behling recorded the sales in an Excel spreadsheet maintained by the City to track equipment and vehicle disposal. Whitmore-Behling remitted the money orders to the City for deposit.

m. Whitmore-Behling and Hepp would then divide the excess cash received from R.G.— *i.e.*, over and above the amount that was used to purchase money orders—between themselves.

6

n. Hepp and Whitmore-Behling executed the same scheme with a few other buyers who purchased individual items from the City. Hepp and Whitmore-Behling were placed on administrative leave from DPW on October 2, 2022, and the sales to R.G. and other external buyers ended at that time.

o. In total, City records indicate that the City collected approximately $35,350 from R.G. and the few other buyers with whom Hepp and Whitmore-Behling executed this scheme. Based on the Bills of Sale retained by R.G. and those other buyers, as well as interviews with them, they paid approximately $136,000 for the City equipment and vehicles they purchased. The City estimates that the fair market value of all of the equipment and vehicles sold in this fraudulent way was approximately $392,861.

p. Whitmore-Behling and Hepp both gambled excessively at the Potawatomi Casino during the months that this scheme was ongoing, using funds embezzled from the City.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines: Count One, 5 years and $250,000; and Count Two, ten years and $250,000. Each count also carries a mandatory special assessment of $100, and a maximum of three years of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraphs 27-28 of this agreement.

8. The defendant acknowledges, understands, and agrees that she has discussed the relevant statutes as well as the applicable sentencing guidelines with her attorney.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of Conspiracy as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

7

First, the charged conspiracy existed (so that two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit theft from a federally funded program);

Second, the defendant knowingly joined the conspiracy with an intent to further it; and

Third, at least one coconspirator committed an overt act in furtherance of the conspiracy.

The parties further understand and agree that in order to sustain the charge of Theft From A Federally Funded Program as set forth in Count Two, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the defendant was an agent of a local government, or any agency of that government, such as the City of Milwaukee;

Second, that the defendant embezzled, stole, obtained by fraud, knowingly and without authority converted to the use of someone other than the rightful owner, or intentionally misapplied some money or property;

Third, that the money or property was owned by, or was under the care, custody, or control of the local government;

Fourth, that the money or property had a value of $5,000 or more; and

Fifth, that the local government or government agency, in a one year period, received benefits of more than $10,000 under any Federal program involving a grant, contract subsidy, loan, guarantee, insurance or other assistance.

## **SENTENCING PROVISIONS**

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

8

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 5. The defendant acknowledges and agrees that her attorney in turn has discussed the applicable sentencing guidelines provisions with her to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

**Sentencing Guidelines Calculations**

14. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

**Relevant Conduct**

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in the information is 6 under Sentencing Guidelines Manual § 2B1.1(a)(2).

## Specific Offense Characteristics

17.     The defendant acknowledges that the Government will recommend to the sentencing court that a 12-level increase is applicable under Sentencing Guidelines Manual §2B1.1(b)(1)(G) to reflect the loss incurred by the victim in this case.

## Acceptance of Responsibility

18.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of her intention to enter a plea of guilty.

## Sentencing Recommendations

19.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

20.     Both parties reserve the right to make any recommendation regarding the fine to be imposed; the length of supervised release and the terms and conditions of the release; the

defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

21.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

22.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

23.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

24.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in

the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

25. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form. The defendant further agrees, upon request of FLP whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

## Special Assessment

26. The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

## Restitution

27. The defendant agrees to pay restitution in the amount of $357,511 to the City of Milwaukee, jointly and severally with co-defendant Kyle Hepp. The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

28. The Government agrees that it will seek to credit any funds forfeited in this case towards restitution.

## DEFENDANT'S WAIVER OF RIGHTS

29. In entering this agreement, the defendant acknowledges and understands that she surrenders any claims she may have raised in any pretrial motion, as well as certain rights which include the following:

    a. If the defendant persisted in a plea of not guilty to the charges against her, she would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and her attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and she would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on her own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e. At such trial, defendant would have a privilege against self-incrimination so that she could decline to testify and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify on her own behalf.

30. The defendant acknowledges and understands that by pleading guilty she is waiving all the rights set forth above. The defendant further acknowledges the fact that her attorney has explained these rights to her and the consequences of her waiver of these rights. The

13

defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

31. The defendant acknowledges and understands that she will be adjudicated guilty of the offenses to which she will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

32. The defendant knowingly and voluntarily waives all claims she may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

33. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives her right to appeal her conviction or sentence in this case and further waives her right to challenge her conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an

14

Case 2:24-cr-00059-LA   Filed 03/18/24   Page 14 of 18   Document 2

appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

### Further Civil or Administrative Action

34. The defendant acknowledges, understands, and agrees that the defendant has discussed with her attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

35. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

36. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

37. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

38. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense

15

on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## Further Action by Internal Revenue Service

39. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40. The defendant acknowledges and understands if she violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of her breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and her attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that she continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41. The defendant acknowledges, understands, and agrees that she will plead guilty freely and voluntarily because she is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12/21/2023

KELLY WHITMORE-BEHLING
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12.21.2023

MURDOCH WALKER
Attorney for Defendant

For the United States of America:

Date: 3/15/24

GREGORY J. HAANSTAD
United States Attorney

Date: 3/15/24

REBECCA TAIBLESON
Assistant United States Attorney

18